IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Zoltar Satellite Alarm Systems, Inc., | NO. C 06-00044 JW |
|     Plaintiff, | **FIRST CLAIM CONSTRUCTION ORDER** |
| v. | |
| Motorola, Inc., et al., | |
|     Defendants. | |
| _____ / | |

## I. INTRODUCTION

Zoltar Satellite Systems, Inc. ("Plaintiff"), brings this patent infringement action against various Defendants.[1] Plaintiff alleges that Defendants infringe four of its patents by making, using, selling, offering for sale, or importing in the United States products or methods that fall within the scope of the patents' claims. The Patents-in-Suit are directed to wireless personal alarm units and systems that have the ability to determine whether to sound an alarm based on

---

[1] Defendants are LG Electronics Mobile Communications Company, LG Electronics, Inc., Motorola, Inc., Audiovox Communications Corp., UTStarcom, Inc., UTStarcom Personal Communications, Sanyo North America Corp., Sanyo Electric Co., Ltd., PalmOne, Inc., Sprint Corp., Samsung Electronics Co. Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America LLC, Nokia Corporation, and Nokia Inc. (See Amended Complaint, hereafter, "AC," Docket Item No. 82.) Currently, Motorola, Inc. and Sprint Corp. are the only Defendants remaining in the case as the following Defendants have been dismissed: Nokia Inc. and Nokia Corp. (Docket Item No. 181); LG Electronics Mobilecomm U.S.A. and LG Electronics, Inc. (Docket Item No. 190); UTStarcom, Inc., UTStarcom Personal Communications, and Audiovox Communications Corp. (Docket Item No. 218); PalmOne, Inc. (Docket Item No. 219.); and Samsung Electronics America, Inc., and Samsung Telecommunications America LLC (Docket Item No. 220).

1 environmental indicators. The claims that Zoltar has asserted in this case are directed to personal
2 alarm remote units that are capable of providing location information.

3 On September 28, 2007, the Court held a hearing in accordance with <u>Markman v. Westview
4 Instruments, Inc.</u>, 517 U.S. 370 (1996), to construe language of the asserted claims over which there
5 is a dispute. This First Claim Construction Order sets forth the Court's construction of the terms in
6 U.S. Patent No. 5,650,770.

## **II.  BACKGROUND**

### **A.  Procedural History**

On June 7, 2005, Plaintiff filed this action in the Eastern District of Texas alleging willful infringement of U.S. Patent Nos. 5,650,770 ("the '770 Patent"), 5,963,130 ("the '130 Patent"), 6,198,390 ("the '390 Patent"), and 6,518,889 ("the '889 Patent") (collectively, "the Patents-in-Suit"). (AC.) The Texas Court transferred here because of the similarity of factual and legal issues between this case and <u>Zoltar Satellite Alarm Systems, Inc. v. SnapTrack, Inc.</u>, Case No. 01-20291 ("Zoltar I"), a case that the Court recently decided. (Joint Case Management Statement at 2, hereafter, "JCMS," Docket Item No. 63.) In Zoltar I, the accused technology was Qualcomm's assisted GPS technology, which Plaintiff referred to as the E-911 service.

In this case, Plaintiff alleges that Defendants infringe the Patents-in-Suit by making, using, selling, offering for sale, or importing into the United States products or methods that fall within the scope of the claims of the Patents-in-Suit. (JCMS at 2.) Defendants deny infringement and assert the affirmative defenses that the Patents-in-Suit are invalid and not infringed. Defendants also assert counterclaims seeking declaratory judgments of non-infringement, invalidity, and unenforceability. (<u>Id.</u>)

Defendants contended that one or more of Plaintiff's proposed claim constructions are precluded under the doctrine of collateral estoppel based on Zoltar I. The Court addressed the issues of collateral estoppel in its October 25, 2007 Order, finding Plaintiff are not precluded from asserting that certain claims are not means-plus-function claims. (<u>See</u> Docket Item No. 221.)

2

**B.  The '770 Patent**

The '770 Patent is entitled: "Self Locating Remote Monitoring Systems."

The Abstract of the '770 Patent provides insight into the nature of Plaintiff's invention. The Abstract describes a personal alarm system as follows:

> A personal alarm system includes a monitoring base station and one or more remote sensing units in two-way radio communication. An electronic handshake between the base station and each remote unit is used to assure system reliability. The remote units transmit at selectable power levels. In the absence of an emergency, a remote unit transmits at a power-conserving low power level. Received field strength is measured to determine whether a remote unit has moved beyond a predetermined distance from the base station. If the distance is exceeded, the remote unit transmits at a higher power level. The remote unit includes sensors for common hazards including water immersion, smoke, excessive heat, excessive carbon monoxide concentration, and electrical shock. The base station periodically polls the remote units and displays the status of the environmental sensors. The system is useful in child monitoring, for use with invalids, and with employees involved in activities which expose them to environmental risk. Alternative embodiments include a panic button on the remote unit for summoning help, and an audible beacon on the remote unit which can be activated from the base station and useful for locating strayed children. In another embodiment, the remote unit includes a Global Positioning System receiver providing location information for display by the base station.

('770 Patent, Abstract.)

## III. STANDARDS AND PROCEDURES FOR CLAIM CONSTRUCTION

**A.  General Principles of Claim Construction**

Claim construction is a matter of law, to be decided exclusively by the Court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 387 (1996). When the meaning of a term used in a claim is in dispute, the Court invites the parties to submit their respective proposed definitions and a brief, outlining the basis for their proposals. In addition, the Court conducts a hearing to allow oral argument of the respective proposed definitions. After the hearing, the Court takes the matter under submission, and issues an Order construing the meaning of the term. The Court's construction becomes the legally operative meaning of the term that governs further proceedings in the case. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). The Court recognizes that claim construction is a fluid process, wherein the Court may consider a number of extrinsic sources of evidence so long as they do not contradict the intrinsic evidence. However, the Court

acknowledges that greater weight should always be given to the intrinsic evidence. Phillips v. AWH Corp., 415 F.3d 1303, 1324 (Fed. Cir. 2005).

**B.    Construction from the View Point of an Ordinarily Skilled Artisan**

A patent's claims define the scope of the patent: the invention that the patentee may exclude others from practicing. Id. at 1312. The Court generally gives the patent's claims their ordinary and customary meaning. In construing the ordinary and customary meaning of a patent claim, the Court does so from the viewpoint of a person of ordinary skill in the art at the time of the invention, which is considered to be the effective filing date of the patent application. Thus, the Court seeks to construe the patent claim in accordance with what a person of ordinary skill in the art would have understood the claim to have meant at the time the patent application was filed. This inquiry forms an objective baseline from which the Court begins its claim construction. Id.

The Court proceeds from that baseline under the premise that a person of ordinary skill in the art would interpret claim language not only in the context of the particular claim in which the language appears, but also in the context of the entire patent specification, of which it is a part. Id. at 1313. Additionally, the Court considers that a person of ordinary skill in the art would consult the rest of the intrinsic record, including any surrounding claims, the drawings, and the prosecution history—if it is in evidence. Id.; Teleflex, Inc. v. Fisosa N. Am. Corp., 299 F.3d 1313, 1324 (Fed. Cir. 2002). In reading the intrinsic evidence, a person of ordinary skill in the art would give consideration to whether the disputed term is a term commonly used in lay language, a technical term, or a term defined by the patentee.

**C.    Commonly Used Terms**

In some cases, disputed claim language involves a commonly understood term that is readily apparent to the Court. In such a case, the Court considers that a person of ordinary skill in the art would give to it its widely accepted meaning, unless a specialized definition is stated in the patent specification or was stated by the patentee during prosecution of the patent. In articulating the

4

widely accepted meaning of such a term, the Court may consult a general purpose dictionary. Phillips, 415 F.3d at 1314.

### D. Technical Terms

If a disputed term is a technical term in the field of the invention, the Court considers that one of skill in the art would give the term its ordinary and customary meaning in that technical field, unless a specialized definition is stated in the specification or during prosecution of the patent. In arriving at this definition, the Court may consult a technical art-specific dictionary or invite the parties to present testimony from experts in the field on the ordinary and customary definition of the technical term at the time of the invention. Id.

### E. Defined Terms

The Court acknowledges that a patentee is free to act as his or her own lexicographer. Acting as such, the patentee may use a term differently than a person of ordinary skill in the art would understand it, without the benefit of the patentee's definition. Vitronics Corp., 90 F.3d at 1582. Thus, the Court examines the claims and the intrinsic evidence to determine if the patentee used a term with a specialized meaning.

The Court regards a specialized definition of a term stated in the specification as highly persuasive of the meaning of the term as it is used in a claim. Phillips, 415 F.3d at 1316-17. However, the definition must be stated in a clear words, which make it apparent to the Court that the term has been defined. See id.; Vitronics Corp., 90 F.3d at 1582. If the definition is not clearly stated or cannot be reasonably inferred, the Court may decline to construe the term pending further proceedings. Statements made by the patentee in the prosecution of the patent application as to the scope of the invention may be considered when deciding the meaning of the claims. Microsoft Corp. v. Multi-Tech Systems, Inc., 357 F.3d 1340, 1349 (2004). Accordingly, the Court may also examine the prosecution history of the patent when considering whether to construe the claim term as having a specialized definition.

In construing claims, it is for the Court to determine the terms that require construction and those that do not. See U.S. Surgical Corp. v. Ethicon, Inc.,103 F.3d 1554, 1568 (Fed. Cir. 1997). Moreover, the Court is not required to adopt a construction of a term, even if the parties have stipulated to it. Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc., 429 F.3d 1364, 1376 (Fed. Cir. 2005). Instead, the Court may arrive at its own constructions of claim terms, which may differ from the constructions proposed by the parties.

## IV. DISCUSSION

The Court proceeds to construe the disputed terms of the '770 Patent.

### A. Claim 55

Claim 55 is not being asserted against Defendants. However, Claim 61, which depends from Claim 55, is being asserted. There is a dispute between the parties over the proper construction of certain phrases in Claim 61 which require construction of the language of Claim 55. Accordingly, the Court begins its consideration with Claim 55.

Claim 55 of the '770 Patent provides:[2]

> A personal alarm system remote unit comprising:
> **a navigational receiver for providing a location of the remote unit**;
> at least one manually operated switch having an output, the at least one switch defining a panic button; and
> **a radio transmitter connected for receiving the remote unit location, the at least one switch output, defining a switch status, and transmitting the remote unit location and the switch status**.

#### 1. "a navigational receiver for providing a location of the remote unit"

The parties dispute the construction of the phrase: "**a navigational receiver for providing a location of the remote unit**." There are four aspects to the dispute: (a) whether the language should be construed as a means-plus-function limitation; (b) whether any construction of "navigational receiver" is necessary and (c) if so, what construction should be given to that phrase; and (d) what construction should given to the phrase "for providing a location of the remote unit."

---

[2] Unless otherwise indicated, all bold typeface is added by the Court for emphasis.

6

### a. The subject phrase is not a means-plus-function limitation.

The subject claim language discloses a component of an apparatus claim and recites a function of the component, namely, "for providing a location of the remote unit."

A claim limitation to a component of an apparatus that recites a function but which does not recite definite structure for performing the recited function is subject to being considered a means-plus-function limitation to be construed in accordance with 35 U.S.C. § 112 ¶ 6. B. Braun Medical, Inc. v. Abbott Laboratories, 124 F.3d 1419, 1424 (Fed. Cir. 1997). When construing a claim limitation under § 112 ¶ 6, the first step in the analysis is to identify the particular claimed function. Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1258 (Fed. Cir. 1999). The second step in the analysis is to look to the specification and identify the corresponding structure for performing that function. Id. The use of the word "means" in a limitation creates a rebuttable presumption that § 112 ¶ 6 applies; similarly, the absence of the word "means" in a limitation creates a rebuttable presumption that § 112 ¶ 6 does not apply. Personalized Media Communications, LLC v. International Trade Com'n, 161 F.3d 696, 703-04 (Fed. Cir. 1998). The presumption against the application of § 112 ¶ 6 may be overcome when a claim limitation does not use the word "means" but, nonetheless, employs functional language. Massachusetts Institute of Technology and Electronics For Imaging, Inc. v. Abacus Software, 462 F.3d 1344, 1353-54 (Fed. Cir. 2006). However, § 112 ¶ 6 does not apply when the claim recites sufficient structure for performing that function. Id.

In this case, the inventors did not use the word "means" in the subject phrase. Thus, there is a rebuttable presumption that § 112 ¶ 6 does not apply. Although the inventors use functional language in the limitation, one of ordinary skill in the art would understand the phrase "navigational receiver" to be a recitation of definite structure which is capable of performing the claimed function. Accordingly, the Court finds that the subject limitation is not a means-plus-function limitation.

### b. Whether construction of "navigational receiver" is necessary

The second issue is whether the phrase "navigational receiver" needs construction. The Court looks first to the claim language itself. The phrase "navigational receiver" is a commonly used phrase meaning a "receiver which receives navigational information." This definition is simply restating the words of the phrase. However, the embodiments of receivers which are discussed in the '770 Patent refer to "global positioning satellites" ("GPS") only. Therefore, the Court considers whether the phrase as used in Claim 55 should be construed to be a GPS receiver.[3]

### c. "navigational receiver"

The specification provides:

> The navigational receiver . . . receives navigational information, as for example from global positioning satellites.

('770 Patent, Col. 11:28-30.)

> The navigational receiver . . . is connected to an antenna . . . for receiving navigational information, such as from global positioning system satellites.

('770 Patent, Col. 12:14-16.)

> [T]he navigational receiver . . . receives navigational information from global positioning system satellites.

('770 Patent, Col. 15:56-58.)

Notwithstanding the reference to GPS receivers as examples of "navigational receivers," there is nothing else in the specification, including the claims, which indicates explicitly or implicitly, that the inventors intended to limit "navigational receiver" to a GPS receiver. At this time, the Court has not been presented with any extrinsic evidence that one of ordinary skill in the art reading the patent documents would have understood "navigational receiver" to be limited to a GPS receiver. Thus, in the construction below, the Court declines to limit the phrase "navigational receiver" to a GPS receiver.

---

[3] The meaning of "navigational information" is disputed within the context of Claim 11 of the '390 Patent and Claims 14 and 17 of the '889 Patent. The Court defers construction of the term until such time as it considers the terms of those patents that are in dispute.

### d. "for providing a location of the remote unit"

The functional phrase "for providing a location of the remote unit" is not subject to § 112 ¶ 6. However, the language is a functional limitation on the "navigational receiver," i.e., it must be "for providing a location of the remote unit."

In the specification, the inventors disclose an embodiment which gives meaning to this function:

> The navigational receiver 304 converts the navigational information into the location of the remote unit 302 and outputs the location 338 to the radio transmitter 314 for transmission to the base station 318.

('770 Patent, Col. 11:28-29.) Thus, although the invention in Claim 55 is not limited to the embodiment discussed in Col. 11:28-29, there are aspects of that embodiment which assist in defining the "for providing a location" function. First, since the preamble to Claim 55 and the subject phrase disclose a "remote unit," inherent in the claim is that the navigational receiver be located in a remote unit of a system which includes a base station. Without a base station, there is no meaning to the word "remote." Second, other language of Claim 55 explicitly provides that the receiver provide "a location."[4] Finally, the radio transmitter limitation, discussed below, limits the recipient of the "location" to "a radio transmitter." Therefore, the navigational receiver must be capable of providing the location of the remote unit to a "radio transmitter."

Accordingly, the Court construes the phrase **"a navigational receiver for providing a location of the remote unit"** as used in Claim 55 of the '770 Patent to mean: **a receiver in a remote unit that receives navigational information, and that provides a location of the remote unit, to a radio transmitter.**

---

[4] The parties have stipulated to the definition of location. The Court defers consideration of whether it will adopt the parties' stipulation. The Court notes that in the specification the inventors distinguish between providing a "location," which is required by Claim 55 (See e.g., '770 Patent, Col. 12:14-18.) and providing "raw navigational information" from which location can be "calculated." (See e.g., '770 Patent, Col. 16:39-47.)

The second part of the remote unit disclosed in Claim 55 is "at least one manually operated switch." The parties have not submitted any dispute over the language of that limitation. The Court proceeds to consider the "radio transmitter" limitation of Claim 55.

### 2. "a radio transmitter connected for receiving the remote unit location, the at least one switch output, defining a switch status, and transmitting the remote unit location and the switch status"

There are several aspects to the dispute with respect to the radio transmitter limitation of Claim 55: (a) whether the limitation is subject to § 112 ¶ 6; (b) the construction of the phrase "radio transmitter," particularly with reference to the functions it performs; and (c) the construction of the phrase "switch status." The Court proceeds to consider each issue in turn.

#### a. Inapplicability of means-plus-function

As with the **navigational receiver** limitation discussed above, the Court finds that although functional language is included in the claim, the **radio transmitter** limitation is not a means-plus-function limitation subject to construction under § 112 ¶ 6.

#### b. "for receiving the remote unit location, the . . . switch output, . . . and transmitting the remote unit location and the switch status"

The second issue is the construction of the functional phrase radio transmitter[5] "for receiving the remote unit location, the . . . switch output, . . . and transmitting the remote unit location and the switch status."

The claim language describes a particular type of radio transmitter—one that is capable of the following functions: (1) "receiving the remote unit location" and "switch output, defining a switch status" and (2) "transmitting the remote unit location and the switch status." The Court examines the specification for any discussion of these functions.

---

[5] The parties have not indicated that there is a dispute over the phrase "radio transmitter." The Court invites the parties to address this issue if there is a dispute.

1    Figure 11 of the '770 Patent, reproduced below, is an embodiment useful for construing the
2 functional language of Claim 55. It illustrates a "radio transmitter connected for receiving the
3 remote unit location" and for "transmitting the remote unit location and switch status."[6]



FIG.-11

The written description which discusses Figure 11 states:

> The navigational receiver 304 receives navigational information, as for example from global positioning satellites 336. The navigational receiver 304 converts the navigational information into a **location of the remote unit** 302 and outputs the location 338 to the radio transmitter 314 for transmission to the base station 318. The sensor 308 provides an output signal 310 and defines a **sensor status**. The output signal 310 is connected to the radio transmitter 314 for transmitting the sensor status to the base station 318.

('770 Patent, Col. 11:29-38.) Thus, for purposes of defining the function "for receiving the remote unit location, the . . . switch output, . . .and transmitting the remote unit location and the switch status" as used in Claim 55, a person of ordinary skill in the art would understand that the inventors

---

[6] For purposes of the this patent, the inventors uses "switch" and "sensor" interchangeably.

meant the functionality and connectivity illustrated in Figure 11 and described in the associated written description.

The parties have agreed that "switch status" means "the description of the state of the switch." (Joint Claim Construction Chart at 17, Docket Item No. 212.) This definition is largely in accordance with the plain meaning of switch status. However, the Court modifies the construction submitted by the parties to mean: "**information on the state of the switch**."

The parties dispute whether the switch status must be "directly" received from the switch in light of the prosecution history of Claim 11 of the '390 Patent.[7] The Court finds that Claim 11 of the '390 Patent describes a different radio transmitter than does Claim 55 of the '770 Patent.[8] Since the claim language is different, the prosecution history with respect to Claim 11 of the '390 Patent does not constitute a disavowal of claim scope for purposes of construing Claim 55 of the '770 Patent. See Ventana Medical Systems, Inc. v. Biogenex Laboratories, Inc., 473 F.3d 1173, 1182 (Fed. Cir. 2006). Although the plain language of Claim 55 requires that the radio transmitter be "connected," the Court declines to read into the claim any limitation with respect to "connected" as "direct," "indirect" or otherwise.

Accordingly, the Court construes the phrase **"a radio transmitter connected for receiving the remote unit location, the at least one switch output, defining a switch status, and transmitting the remote unit location and the switch status"** as used in Claim 55 of the '770 Patent to mean:

---

[7] (See, e.g., Plaintiffs' Responsive Claim Construction Brief at 17, hereafter, "Opposition CCB," Docket Item No. 202.)

[8] The "for" clause of each of these claims defines a purpose for each radio transmitter limitation. Particularly, Claim 11 of the '390 Patent requires "a radio transmitter for transmitting demodulated navigational information, the precise time-of-day information, and the switch status" while Claim 55 of the '770 Patent requires "a radio transmitter connected for receiving the remote unit location, the at least one switch output, defining a switch status, and transmitting the remote unit location and the switch status." (See '390 Patent, Col. 29:50-53; '770 Patent, Col. 22:60-23:2.) Thus, each of these radio transmitters form different limitations, as they are defined by different functional requirements.

**a radio transmitter that is connected: to the navigational receiver and receives the remote unit location from the navigational receiver; and to at least one manually operated switch and receives switch output, defining the state of the switch. The radio transmitter transmits the remote unit location and information on the state of the switch.**

**B.     Claim 61**

Claim 61 of the '770 Patent provides:

The personal alarm system remote unit as set forth in claim 55, further comprising:
**a radio receiver for receiving a command;** and
the transmission power level **selection circuit** being responsive to the received command **for selecting the transmission power level**.

**1.     "a radio receiver for receiving a command"**

The parties dispute the construction of the phrase "a radio receiver for receiving a command."

The plain and ordinary meaning of "radio receiver" is a receiver that receives radio signals.[9] The radio receiver of Claim 61 must meet the functional limitation that it be capable of "receiving a command."[10] The word "command" has a commonly understood meaning when interpreted with respect to radio signal processing. A "command" is "[o]ne of a set of several signals . . . that occurs as a result of interpreting an instruction; the command[] initiate[s] the individual steps that form the process of executing the instruction's operation." INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERING (IEEE) DICTIONARY OF STANDARDS TERMS, 193 (7th ed. 2000). Thus, a command is a particular species of radio signals, i.e., one which communicates an instruction to perform an operation.

//

---

[9] See note 5.

[10] Although the phrase includes a functional limitation, the language recited definite structure and is not subject to construction under § 112 ¶ 6

13

The specification contains the following Figure 5, which illustrates that the inventors used the word "command" with its plain and ordinary meaning:



With respect to Figure 5, the specification provides:

> FIG. 5 is a pictorial diagram of a preferred digital format for a **base station to remote unit transmission**, generally indicated by the numeral 180. The digital message format 180 includes **a command** field 182 and a plurality of unassigned bits 190 reserved for future application. . . . .

('770 Patent, Col. 7:61-65.) The parties dispute whether the word "command" should be construed to include a radio signal having a particular strength if the signal strength causes the radio receiver to perform an operation.

From the specification as a whole, but in particular from Figure 5 and the accompanying discussion, it is evident that the "command" which the radio receiver must be capable of receiving under Claim 61 is a "command" from the base station. In the specification, the inventors use the word "command" to discuss a particular kind of signal, i.e., one representing an instruction from the base station to the remote unit that requires the remote unit to perform an operation. When used in this fashion, the meaning of "command" is narrower than the meaning of "signal,"[11] even were a "signal" to carry the characteristic of "signal strength." A "command" is a certain type of

---

[11] The common and ordinary meaning of signal is as broad as any "physical representation of data." INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERING (IEEE) DICTIONARY OF STANDARDS TERMS, 1047 (7th ed. 2000).

signal—one that communicates an **instruction** to perform an operation rather than a **characteristic** upon which an operation may be performed.

Accordingly, the Court construes the word **"command"** to mean: **a signal representing an instruction to perform an operation. In Claim 61 of the '770 Patent, the radio receiver is in a remote unit and receives a command from a base station.**[12]

### 2. The language of the radio transmitter limitation is not insoluably ambiguous

The third part of the "remote unit" disclosed in Claim 61 is "the transmission power level selection circuit." There are a number of disputes with respect to the claim language describing this component. First, there is a dispute over whether the language is too ambiguous for construction.

Claim 61 is the first disclosure of a selection circuit. Under the conventions of claim drafting, which follow the normal rules of grammar, the first time a part is mentioned, it should be preceded by the indefinite article "a," i.e., "a selection circuit." Subsequent references to that circuit should be preceded by the definite article "the" or with "said." See MPEP Section 2173.05(e). The first disclosure of a selection circuit Claim 61 uses the definite article, "the." The lack of an antecedent disclosure of "a selection circuit" potentially makes the reference to "the" selection circuit ambiguous. An ambiguity in a claim is problematic for claim construction because it could render the claim "insolubly ambiguous." When a claim is "insolubly ambiguous," a court need not construe the claim because it is indefinite. However, when, despite an ambiguity, the "meaning of the claim is discernible," the court should proceed to construe the claim in accordance with that meaning. See Exxon Research & Eng'g Co. v. United States, 265 F.3d 1371, 1375 (Fed. Cir. 2001).

The Court finds that the use of "the" instead of "a" to be an error in drafting that does not obscure the ability of the Court to discern a meaning of "the selection circuit," when the claim

---

[12] The construction that the radio receiver receive a command from a "base station" is required by the claim language disclosing a "remote unit" which contains a "selection circuit." It is also required by the specification in which the relevant embodiment of the "selection circuit" discloses that the command be received from a base unit. See discussion in Section (IV)(B)(5).

15

language is construed in light of the specification. The Court proceeds to consider the other disputes with respect to the selection circuit.

### 3. Inapplicability of means-plus-function analysis

The second issue is whether the use of a functional limitation "for selecting the transmission power level" invokes means-plus-function analysis. While the language disclosing a **selection circuit** uses the functional language, i.e., "for selecting the transmission power level,"[13] the Court finds the inventors' recital of a "transmission power level selection circuit" is sufficient structure for performing the claimed function. Accordingly, the Court finds that the **selection circuit** limitation is not a means-plus-function limitation.

### 4. "transmission power level selection circuit"

The third issue is the construction of the phrase "transmission power level selection circuit." The plain and ordinary meaning of "selection circuit" is "a circuit that selects between or among alternatives." In general, the parties do not dispute this interpretation; they agree that the "selection circuit" disclosed in Claim 61 selects the transmission power level.[14] The dispute is over the phrase "transmission power level."

The specification discusses "transmission power level" with respect to an embodiment of the radio transmitter in a remote unit:

> The remote unit transmitter 86 is capable of transmitting at a power-conserving lower power level and also at an emergency higher power level.

('770 Patent, Col. 8:62-64.) Thus, the Court finds that one of ordinary skill on the art would have understood the "transmission power level selection circuit" to be a circuit that selects the power level at which the radio transmitter transmits.

---

[13] The Court considers that the prepositional phrase "for selecting the transmission power level" modifies the noun "circuit" and not the noun "command" because "command" has a antecedent basis in the preceding **radio receiver** limitation that makes no direct reference to a function for selecting the transmission power level.

[14] (Opposition CCB at 24; Plaintiff's Reply Brief Regarding Claim Construction at 16, Docket Item No. 208.)

16

### 5.    "responsive to the received command"

The final issue which must be resolved with respect to the selection circuit is the limitation that the selection circuit be "responsive to the received command."

The antecedent of "the received command" is the "command" received by the radio receiver discussed in Section (IV)(B)(1) above. As discussed above, Figure 5 is a diagram of the "preferred" method of transmission to the remote unit. Both the caption of Figure 5 ("Message format: Base to Remote") and the written description indicate that the "command" received by the radio receiver originates in the base station:[15]

> The command field 182 includes a coded field of bits 184 used to command a specific remote unit to transmit its response message (using the format 150). The command field 182 also includes a single bit 186 used **to command a remote unit such as the embodiment illustrated in FIG. 3, to transmit at high power.**

('770 Patent, Col. 7:65-8:4.)

Figure 3 and the accompanying written description discloses an embodiment of a remote unit which receives a power selection command from a base station and which contains a power level selection circuit that is "responsive to the received command":



---

[15] In Irdeto Access, Inc. v. Echostar Satellite Corp., 383 F.3d 1295, 1300 (Fed. Cir. 2004), the Federal Circuit noted, "Even when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents."

Notably, the illustration of Figure 3 and the related disclosure in the specification make reference to a "command" being received by the remote unit radio receiver. The "command" is passed to the "power level select circuit," which then commands the radio transmitter to change the power level of its transmission. ('770 Patent, Col. 8:64-9:2.) The Court finds Figure 3 and the accompanying written description particularly appropriate for construction of Claim 61 because Figure 3, as well as Figure 12, disclose power level selection based on commands received from the base station, rather than power level selection calculated on the basis of the strength of the received signal.

In construing Claim 61, the Court relies on the specification's reference to Figure 3 instead of its reference to Figure 1. In the discussion of Figure 3, the inventors specifically refer to receipt of a "command," while in the discussion of Figure 1, the inventors use the general term "signal." In addition, to meet the limitations of Claim 61, the signal must carry an instruction before it is received by the remote unit. The embodiment illustrated in Figure 3 would satisfy that limitation. There is no discussion of how Figure 1 would meet that limitation. Thus, the Court finds that one of ordinary skill in the art would have understood "responsive to the received command" to mean that the selection circuit selects the transmission power level in response to the signal, or set of signals containing an instruction from a base station that requires the remote unit to perform an operation.

Accordingly, the Court construes the phrase, **"the transmission power level selection circuit being responsive to the received command for selecting the transmission power level"** as used in Claim 61 of the '770 Patent to mean: **a circuit in a remote unit that is responsive to an instruction from a base station to select a power level at which the radio transmitter in the remote unit transmits.**

## V. CONCLUSION

In this Order the Court has construed some of the disputed terms of the '770 Patent. Some of the terms for which the parties initially requested construction are not addressed in this Order because either the Court declines to construe them or they are the same or substantially the same as

terms that the Court has construed. To the extent a party contends that an omitted term should be addressed, a supplemental request for construction should be made on a timely basis.

The Court sets a Case Management Conference for **February 11, 2008 at 10 AM.** to coincide with the hearing at 9 A.M. on Defendants' Motion to Amend Preliminary Invalidity Contentions. Pursuant to the Civil Local Rules of Court, the parties shall file a Joint Case Management Statement by **February 1, 2008**. The statement shall address how the Court's First Claim Construction Order affects the terms in dispute in the remaining Patents-In-Suit, further proceedings in the case in light of this Order and a schedule for those proceedings.

Dated: December 21, 2007

JAMES WARE
United States District Judge

United States District Court
For the Northern District of California

1 | **THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

2 | Aaron Benjamin Thacker aaron.thacker@hellerehrman.com
Amy Kathleen VanZant avanzant@hewm.com
3 | Andrew Ellis Monach amonach@mofo.com
Anthony Hyeok Son Ason@foleylaw.com
4 | Choongsoo Park park@fr.com
Chris N. Cravey ccravey@wmalaw.com
5 | Danny L. Williams danny@wmalaw.com
David Baxter Moyer dmoyer@foley.com
6 | Eric Cha echa@jonesday.com
Hae-Chan Park hpark@park-law.com
7 | Hilda C. Galvan hcgalvan@jonesday.com
Howard B. Miller hmiller@girardikeese.com
8 | Jaideep Venkatesan jay.venkatesan@hellerehrman.com
Jingming (James) Cai jcai@flglawyer.com
9 | Jingming (James) Cai jcai@flglawyer.com
John J. Feldhaus jfeldhaus@foley.com
10 | Joshua Burrill Pond pond@fr.com
Keith B. Davis kbdavs@jonesday.com
11 | Lawrence A Rouse larryr@rhgm.com
Lina M. Brenner lmbrenner@duanemorris.com
12 | Mark N. Reiter mnreiter@jonesday.com
Mark William McGrory markm@rhgm.com
13 | Michael J. McKeon mckeon@fr.com
Michael Junwhan Song msong@foley.com
14 | Michael Kenneth Plimack mplimack@hewm.com
Michael Myles Markman mmarkman@hewm.com
15 | Nathaniel Philip Bruno nbruno@sheppardmullin.com
Robert T. Haslam Robert.Haslam@hellerehrman.com
16 | Ron Schlager LeglBeagl1@AOL.com
Shelley Kay Mack mack@fr.com
17 | Steven R. Katz katz@fr.com
Tharan Gregory Lanier tglanier@jonesday.com
18 | Wayne Michael Helge whelge@park-law.com

20 | **Dated: December 21, 2007**     **Richard W. Wieking, Clerk**

22 |                                  **By:   /s/ JW Chambers**
                                       **Elizabeth Garcia**
23 |                                    **Courtroom Deputy**